**In re CAMERON COUNTY WATER IM-
PROVEMENT DIST. NO. I.
No. 520.**

District Court, S. D. Texas,
Brownsville Division.
Dec. 1, 1934.

A. L. Montgomery, of San Benito, Tex., and Greenwood & Lewis and W. B. Lewis, all of Harlingen, Tex., for petitioner.

W. P. Hamblen, Baker, Botts, Andrews & Wharton, and Palmer Hutcheson, all of Houston, Tex., and Joyce Cox, of Galveston, Tex., for contestants.

KENNERLY, District Judge.

Cameron County Water Improvement District No. 1 (referred to for convenience as petitioner) filed in this court, July 17, 1934, its petition, and August 22, 1934, its amended petition, seeking readjustment of its outstanding bonds, under the Act of Congress of May 24, 1934, relating to the emergency temporary aid of public debtors, and amendatory of the Bankruptcy Act of July 1, 1898 (sections 301, 302, and 303, title 11, USCA). The petition was set for hearing for October 1, 1934, and on that date, C. L. Ashton, J. W. Terry, individually and as trustee for Rebecca Terry White, C. W. Griffin, A. G. Griffin, L. E. Wood, and West Coast Life Insurance Company (referred to for convenience as contestants), alleging that they owned bonds of petitioner aggregating approximately $78,000 (being more than 5 per cent. of petitioner's bonds outstanding), appeared and filed an intervention and contest, thereby, and by their motion to dismiss, raising various questions regarding the constitutionality of such act of Congress, the jurisdiction of this court of such petition, and the sufficiency of the petition.

The facts shown by, and fairly deducible from, such petition are:

(a) While the petition wholly fails to set forth the time of, manner of, and authority for, the organization of petitioner as a water improvement district, which it claims to be, and fails to set forth clearly the date, manner of issue, number, amount, and terms and conditions of the bonds which petitioner seeks to have readjusted (and probably should be stricken for indefiniteness in that

respect), it appears generally therefrom, from the briefs, and from the Texas statutes, that petitioner is an irrigation district, containing approximately 42,000 acres of land in Cameron county, Tex., in this district and division, organized under certain acts of the Legislature of Texas, which were codified as, and are now, articles 7622[1] to 7807, inclusive, of the Texas Revised Civil Statutes of 1925, which statutes were apparently passed in accordance with section 52 of article 3, and section 59a of article 14, of the Texas Constitution. It further appears that such bonds were issued, and tax levy or levies made against all property in the district, to provide for the payment of the principal and interest thereon, in accordance with such statute. And that such tax levies are and constitute liens on and against all such property, which liens still exist and are in full force and effect.

(b) Petitioner alleges it has outstanding approximately $800,000 of such bonds, a part of which are known as Cameron County Irrigation District No. 1 (the former name of petitioner) bonds, and part as Cameron County Water Improvement District No. 1 (the present name of petitioner) bonds.

(c) That petitioner has been supplying water for irrigation to farmers in such district for approximately twenty years, and (quoting from the petition): "That about two and a half years ago the country entered into a general financial depression causing great reduction in the price which the farmers received for their fruits and vegetables; the price being placed at such a low basis that even it did not pay the cost of production, thereby making it impossible for the farmers of said District to pay their Flat Rates and bond tax; and created a condition as described fully in Section 80, Chapter LX of said House Bill Number 5950, mentioned above, and did create such a condition that this Petitioner is insolvent and is unable to meet its debts as they mature, and that this District desires to effect a plan of re-adjustment of its debts as provided by Section 80 above described."

(d) There is no allegation and apparently no claim that an effort has been made by petitioner to collect the tax levied to pay the bonds. It must be assumed there has been no such effort. There is no allegation and apparently no claim that there has been any loss of, or depreciation in the value of, the property in such district upon which such tax is a lien, and no showing that the full amount of such tax may not be speedily realized and collected by the diligent enforcement by petitioner of the law for the collection thereof. The sole claim is that during one or more years of the "financial depression," the price received by farmers for their fruits and vegetables has been below the cost of production, making them unable to pay their "Flat Rates" and "Bond Tax." Whether taxpayers other than farmers are so situated is not shown. Presumably they are not, or petitioner would have alleged it.

(e) It is further alleged that petitioner (italics mine) "decided that a fair proposition to all concerned would be to pay the bond holders 49.8 cents upon each dollar of principal, which the Reconstruction Finance Corporation agreed to furnish and agreed to loan to the District at four (4%) percent instead of six (6%) percent; said proposition being *absolutely satisfactory to Cameron County Water Improvement District Number One, your Petitioner herein.*"

[1] Article 7622 is as follows: "Art. 7622. *Water improvement districts established.*— The county commissioners' court of any county in this State at any regular or called session thereof may establish one or more water improvement districts in their respective counties, or parts of such districts therein, in the manner hereinafter provided. Such districts may or may not include within their boundaries villages, towns, cities, and municipal corporations, or any part thereof, but no land shall be at the same time included within the boundaries of more than one water improvement district created under this chapter. Such districts when so established may make improvements or may purchase improvements already existing, or may purchase improvements and make additions thereto, and may issue bonds in payment therefor, as herein provided. Such districts being authorized to provide for the irrigation of the land included therein, and when operating under Section 59 of Article 16 of the Constitution, furnish water for domestic, power and commercial purposes. Such districts may be formed for co-operation with the United States under the Federal Reclamation Laws for the purpose of the construction of irrigation works, including drainage works, necessary to maintain the irrigability of the land for the purchase, extension operation or maintenance of constructed works or for the assumption, as principal or guarantor, of indebtedness to the United States on account of district lands. (Acts 2nd C. S., 1919, p. 65, part Sec. 1.)"

(f) Petitioner alleges that it has written acceptances from holders of more than 30 per cent. of the outstanding bonds, and will upon a hearing have acceptances from holders of 66⅔ per cent. required by such act of Congress.

1. The first inquiry is as to the legal status of petitioner and of the bonds in question. That petitioner, so far as disclosed by its petition, is merely an agency or instrumentality of the state of Texas, created by the state for the purpose of the local exercise of the state's sovereign powers, is clear. The reclamation of arid land by irrigation has long been recognized to be a matter of public interest, for the general welfare, and a governmental function. The property of the district is not private property, but public property. Petitioner is not carrying on private business, but public business.

The bonds are contracts, constitutionally and statutorily executed by the state of Texas, through petitioner, its local agency, secured by taxes levied against property in the district, which taxes are secured by liens against such property. Articles 7622 to 7807, inclusive, Texas Revised Civil Statutes; McQuillin, Law of Municipal Corporations (2d Ed. 1928) §§ 125 and 135. Texas & P. Ry. Co. v. Ward County Irrigation District No. 1, 112 Tex. 593, 251 S. W. 212; Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; Parker v. El Paso County Water Improvement District No. 1, 116 Tex. 631, 297 S. W. 737; Robbins v. Limestone County, 114 Tex. 345, 268 S. W. 915; Baker v. Dunning, 77 Tex. 28, 13 S. W. 617.

2. The bonds being obligations of Texas, a sovereign state, and/or petitioner, its agency, does Congress have the power to confer upon this court jurisdiction to readjust same in the manner set forth in such act of Congress?

Legal writers, generally, find in the Roman Law the germ of modern bankruptcy statutes. There are those, however, who find it in the Mosaic Law at a much earlier date (The System Bible Study, p. 200[2]). Relief by bankruptcy in some form is provided by the laws of substantially all civilized countries. In the United States, the Constitution makes provision for such laws.[3] There have been four Bankruptcy Acts, including the one now in force. The first act was passed April 4, 1800 (2 Stat. 19), and repealed December 19, 1803 (2 Stat. 248). The second act was enacted August 19, 1841 (5 Stat. 440), and repealed March 3, 1843 (5 Stat. 614). The third act was passed March 2, 1867 (14 Stat. 517), was amended June 22, 1874 (18 Stat. 178), and finally repealed September 1, 1878 (20 Stat. 99). The law now in force was enacted July 1, 1898 (30 Stat. 544), and has been frequently amended, February 5, 1903 (32 Stat. 797), June 15, 1906 (34 Stat. 267) June 25, 1910 (36 Stat. 838), etc. (11 USCA § 1 et seq.). The act under discussion (May 24, 1934) is one of five amendments, passed by Congress during 1933 and 1934,[4] all entirely or to an extent enacted in connection with relief against the financial depression. It contains a declaration of national emergency: "There is hereby found, determined, and declared to exist a national emergency caused by increasing financial difficulties of many local governmental units, which renders imperative the further exercise of the bankruptcy powers of the Congress of the United States. (July 1, 1898, c. 541, § 78, as added May 24, 1934, c. 345, 48 Stat. 798)." 11 USCA § 301.

It is temporary in its nature, expiring two years from May 24, 1934.

---

[2] "Jubilee, Year of.—The great semicentennial epoch of the Hebrews; constituting a festival, and marked by striking public and domestic changes. It was the final consummation of the sabbatical system, according to which every seventh day was a sabbatical day, every seventh year a sabbatical year, and every fiftieth year (i. e., every year following after the close of seven sabbatical periods, each of seven years) a 'jubilee' year, beginning on the Day of Atonement, and ushered in by the blast of trumpets. *The principal feature of this jubilee, and one not entirely unknown to other people, was the return of all landed estates, except houses built in walled towers, to the family whose inherit-* *ance it originally had been, irrespective of the manner in which it had been alienated. Minor features were the giving up of all pledges, the setting free of all servants, etc. No religious observances were prescribed.* For details as given in the Bible, see Lev. 25:8–16, 23–55; 27:16–25." (System Bible Study, p. 200).

[3] Section 8, article 1, of the Constitution of the United States: "The Congress shall have Power * * * To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States. * * *"

[4] Sections 201, 202, 203, 204, 205, 206, 207, 301, 302, and 303, title 11, United States Code Annotated.

■ The fact that it is temporary in its nature is of no consequence if it is contrary to the Federal Constitution. The fact that the act was enacted during a declared national emergency does not aid in its construction, nor does it create power in Congress to enact it. National emergency may furnish the occasion for the exercise of power, if it exists, but cannot create the power. Home Building & Loan Association v. Blaisdell, 290 U. S. 426, 54 S. Ct. 231, 78 L. Ed. 423, 88 A. L. R. 1481; Travelers' Insurance Co. v. Schuyler B. Marshall (Tex. Sup.) 76 S.W.(2d) 1007, decided November 21, 1934.

Nor does an examination of the four Bankruptcy Acts (1800, 1841, 1867, and 1898), and cases[5] construing them, greatly aid.

■ The leading case under the act of 1898 (Hanover National Bank v. Moyses, supra), while holding section 8, article 1, of the Constitution to be broad in its scope, falls far short of being authority for the view that Congress may confer jurisdiction upon this court to readjust, in the manner provided in this act, bonds issued by a sovereign state and/or its agency, and payable out of funds provided by taxation, except by permission of such state.[6] I conclude that Congress has no such power. And that this is true, no matter for what governmental purpose such agency may be created. The controlling feature is that petitioner, as shown by its petition, is an agency of the state, and one through which the state is exercising its governmental functions of levying and collecting taxes to pay these bonds issued and sold to enable petitioner to perform a governmental function of irrigating arid lands.

■ To hold otherwise would be not only to go far beyond the real purpose and meaning of section 8, article 1, of the Federal Constitution, but to strike down the long-recognized rule that under our dual system of government (national and state), one government may not by its laws impair the sovereignty of the other. Although the national government and the state governments exist within the same territorial limits, they act, each in their appropriate sphere, separately and independently, and it is indispensable to their preservation and safety that the sovereignty of each be preserved. As early as 1871, Mr. Justice Nelson, in Buffington v. Day, 11 Wall. 113, 125, 20 L. Ed. 126, in discussing the question of the right of the national government to tax the salary of a state court judge, uses this language: "The Constitution guarantees to the States a republican form of government, and protects each against invasion or domestic violence. Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which is so indispensable, that, without them, the general government itself would disappear from the family of nations, it would seem to follow, as a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less defeated by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence. A despotic government might. We have said that one of the reserved powers was that to establish a judicial department, it would have been more accurate, and in accordance with the existing state of things at the time, to have said the power to maintain a judicial department. All of the thirteen States were in the possession of this power, and had exercised it at the adoption of the Constitution; and it is

[5] Hanover National Bank v. Moyses, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113; Hurley v. Devlin (D. C.) 151 F. 919; In re Klein, Fed. Cas. No. 7,865, 1 How. 277, note; Leidigh Carriage Co. v. Stengel (C. C. A.) 95 F. 637; In re California Pacific Railway Co., 4 Fed. Cas. 1060, No. 2,315; 1 Collier on Bankruptcy (12th Ed. 1921); Williams v. United States Fidelity & Guaranty Co., 236 U. S. 549, 35 S. Ct. 289, 59 L. Ed. 713.

[6] My information is that a Bill giving such permission was introduced at the last Special Session of the Texas Legislature, but passed only one House of the Legislature. Whether under Travelers' Insurance Co. v. Marshall, supra, the Legislature has the power to give such permission is not before me.

not pretended that any grant of it to the general government is found in that instrument. It is, therefore, one of the sovereign powers vested in the States by their constitutions, which remained unaltered and unimpaired, and in respect to which the State is as independent of the general government as that government is independent of the States."

The question of the maintenance of the sovereignty of each government has more frequently arisen and been discussed in cases involving taxation,[7] but the principle is well grounded, and arises, and should be enforced in this case, where petitioner, an agency of a sovereign state, and without permission of the state, is asking that it be relieved of liability for more than 50 per cent. of its bonds.

In Indian Motocycle Co. v. United States, supra, a distinction is pointed out between an agency of a sovereign state engaged exclusively in public business, and one engaged wholly or in part in private business. If this distinction exists in a case such as this, which involves the power of Congress under section 8 of article 1 of the Federal Constitution, it is not necessary to discuss it here. Here, petitioner, according to its petition, is not engaged wholly or in part in private business, but exclusively in public business, and the bonds which petitioner is seeking to have readjusted *are payable from funds raised by taxation.*

■■ 3. Contestants say that even if the act of Congress in question is constitutional, and even if this court has jurisdiction to administer the affairs of petitioner under such act, petitioner's petition, upon its face, presents a financial situation or set-up under which petitioner is entitled to no relief.

It will be observed that the Texas statutes under which petitioner is organized, and under which the bonds in question were issued, provide for the levy each year of a tax against the property in such district to raise funds to pay the bonds and interest thereon. While petitioner does not so state, the fair inference from petitioner's petition, and the presumptions that petitioner's officers have done their duty, is that the tax has been levied, the lien securing same fixed against the property in the district, and that under such statutes such lien is in full force and effect. As has been pointed out, petitioner does not claim that the property against which said taxes are a lien no longer exists, or that it has depreciated in value to the extent that a sale thereof will not produce funds sufficient to pay the tax. Neither does the petition state what, if any, effort has been made to collect the tax or to enforce the payment thereof and the lien securing same. Without explanation as to the status of other taxpayers in the district, petitioner contents itself with the allegation that the farmers in the district, during a period of time not set forth, have been unable to sell their products for an amount sufficient to pay the tax. There being no allegation other than this, there can be no proof other than this. Clearly, therefore, petitioner by its petition does not present a case authorizing this court to strike down more than 50 per cent. of the face value of the bonds held by contestants, and require contestants to receive, in full settlement thereof, approximately 49.8 per cent. of their face value, when so far as appears from petitioner's petition, there may be funds available, or funds may become available, by the slightest diligence on the part of petitioner in collecting the tax levied to pay the bonds in full. Clearly, the act of Congress, if valid, does not contemplate or authorize a proceeding so unfair and inequitable.

There are many other questions presented which, under this view, I find it unnecessary to discuss. It follows from what has been said that petitioner's petition should be dismissed for want of jurisdiction.

Let an order be drawn and presented accordingly.

[7] Dobbins v. Erie County, 16 Pet. 435, 10 L. Ed. 1022; McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579; Weston v. Charleston, 2 Pet. 449, 7 L. Ed. 481; Lane County v. Oregon, 7 Wall. 76, 19 L. Ed. 101; Buffington v. Day, 11 Wall. 128, 20 L. Ed. 126; Willcuts v. Bunn, 282 U. S. 230, 51 S. Ct. 125, 75 L. Ed. 310, 71 A. L. R. 1260; Indian Motocycle Co. v. United States, 283 U. S. 574, 51 S. Ct. 601, 75 L. Ed. 1281.